**SHEEHAN & ASSOCIATES, P.C.**
Spencer Sheehan
505 Northern Blvd., Suite 311
Great Neck, NY 11021
Telephone: (516) 303-0552
Facsimile: (516) 234-7800
*spencer@spencersheehan.com*

| | |
|---|---|
| United States District Court<br>Eastern District of New York | 1:19-cv-05278 |
| Suseel Thomas, individually and on behalf of all others similarly situated,<br><br>        Plaintiff<br><br>    - against -<br><br>Costco Wholesale Corporation<br><br>        Defendant | Complaint |

   Plaintiff by attorneys alleges upon information and belief, except for allegations pertaining to plaintiffs, which are based on personal knowledge:

   1.  Costco Wholesale Corporation ("defendant") marketed, advertised, distributed and sold various formulations of the herbicide Roundup®, which contains the active ingredient glyphosate and is defective, dangerous to human health, unfit and unsuitable to be marketed and sold in commerce without proper warnings and directions as to the dangers associated with its use

   2.  Roundup was sold at defendant's stores in the United States, including in New York.

   3.  Glyphosate is a nonselective herbicide that inhibits plant growth through interference with the production of essential aromatic amino acids.

   4.  It was discovered to be an herbicide in 1970 and was brought to the market as Roundup by Monsanto Company in 1974.

   5.  All formulations of Roundup® are manufactured by Monsanto Company, Bayer

1

Corporation, and/or Bayer AG.

6. "Roundup" or the "Product" refers to all formulations of the Roundup® products sold by COSTCO, including but not limited to, Roundup Landscape Weed Preventer, Roundup Ready-To-Use Killer III with Sure Shot Wand, Roundup Ready-To-Use Weed & Grass Killer III with Comfort Wand, Roundup Ready-to-Use Weed & Grass Killer III with Pump 'N Go 2 Sprayer, Roundup Ready-To-Use Weed & Grass Killer III, Roundup Precision Gel Weed & Grass Killer, Roundup for Lawns Bug Destroyer, Roundup For Lawns Ready-to-Use, Roundup For Lawns1 Ready-to-Spray, Roundup For Lawns3 Ready-to-Spray, Roundup For Lawns2 Concentrate, Roundup for Lawns Crabgrass Destroyer1, Roundup Ready-To-Use Max Control 365 with Comfort Wand, Roundup Concentrate MAX Control 365, Roundup Ready-To-Use Extended Control Weed & Grass Killer Plus Weed Preventer II with Comfort Wand, Roundup Ready-To-Use Extended Control Weed & Grass Killer Plus Weed Preventer II with Pump 'N Go 2 Sprayer, Roundup Ready-To-Use Extended Control Weed & Grass Killer Plus Weed Preventer II with Trigger Sprayer, Roundup Concentrate Extended Control Weed & Grass Killer Plus Weed Preventer, Roundup Ready-To-Use Poison Ivy Plus Tough Brush Killer with Trigger Sprayer, Roundup Ready-To-Use Poison Ivy Plus Tough Brush Killer with Comfort Wand, Roundup Concentrate Poison Ivy Plus Tough Brush Killer, Roundup Weed & Grass Killer Concentrate Plus, Roundup For Lawns2 Concentrate, Roundup Weed & Grass Killer Super Concentrate, Roundup Weed & Grass Killer Super Concentrate, Roundup Concentrate MAX Control 365, Roundup Concentrate Extended Control Weed & Grass Killer Plus Weed Preventer, Roundup Concentrate Poison Ivy Plus Tough Brush Killer, Roundup Pro No Leak Pump Backpack Sprayer (4 Gallon), Roundup Pro Sprayer for Commercial Use (2 or 3 Gallon), Roundup No Leak Pump Backpack Sprayer (4 Gallon), Roundup Pro No Leak Pump Backpack Sprayer with Stainless Steel

Components and Deluxe Comfort Harness (4 Gallon), Roundup Multi-Use Home and Garden Sprayer (1, 2, or 3 Gallon), or any other formulation thereof containing the active ingredient glyphosate.

A. <u>Warnings on Roundup Products at Defendant's Retail Locations are Inadequate</u>

7. The front label of the Product only provides the warnings "Keep Out of Reach of Children" and "Caution."



8. The only identified hazard is that it may cause "moderate eye irritation."

9. Defendant fails to warn consumers of the carcinogenic risks of using the Products and fails to include proper use instructions for Roundup.

10. As a retail distributor of the Products, Defendant is provided a Safety Data Sheet

("SDS") by the manufacturer, which provides detailed information as to the products' hazards.[1]

11. The Roundup SDS advises it is health hazardous[2]:

**EYES AND FACE**: Workers handling the concentrate should wear chemical goggles to prevent eye contact during mixing/transfer operations or other activities where there is potential for eye contact with the concentrated product. The wearing of goggles is not required during use of this product in accordance with label instruction.

**SKIN**: Although this product does not present a significant skin concern, minimize skin contamination by following good industrial practice. Wearing protective gloves is recommended. Wash hands and contaminated skin thoroughly after handling.

**RESPIRATORY**: For Handling the Concentrated Product: Avoid breathing vapor or mist. This product concentrate is not likely to pose an airborne exposure concern during manufacture or packaging. In the event of abnormal exposure conditions, use NIOSH approved equipment. Air purifying elements for protection against organic vapor and dust/mist approved for pesticides is recommended. Full facepiece replaces the need for chemical goggles. Observe respiratory use limitations specified by the manufacturers. Respiratory protection programs must comply with 29 CFR 1910.134.

12. Defendant is aware of the danger of the product through its handling directions and explicit instructions for disposal or the Product and container.[3]

---

[1] The Hazard Communication Standard (HCS) (29 CFR 1910.1200(g)), revised in 2012, requires that the chemical manufacturer, distributor, or importer provide Safety Data Sheets (SDSs) (formerly MSDSs or Material Safety Data Sheets) for each hazardous chemical to downstream users to communicate information on these hazards. The information contained in the SDS is largely the same as the MSDS, except now the SDSs are required to be presented in a consistent user-friendly, 16-section format. This brief provides guidance to help workers who handle hazardous chemicals to become familiar with the format and understand the contents of the SDSs.

[2] Material Safety Data Sheet, Roundup Weed & Grass Killer 1 Ready-To-Use,, **EPA REG. NO.:** 71995-23 **PN:** 7037 (October 31, 2000).

[3] Material Safety Data Sheet, *supra* (fn. 3), at ¶13 (Giving specific instructions on how to dispose of the Product).

13. Defendant does not warn consumers they may be exposed to glyphosate through inhalation and skin contact.

14. Defendant omits proper use instructions, e.g., advising consumers to use a gas mask respirator when using Roundup.[4]

15. The Product's front label does not instruct consumers of the need for eye, skin or respiratory protection, *viz*, there is no instruction on the need for chemical goggles, chemical resistant gloves, or a respirator (or that a full facepiece/hood/helmet respiratory replaces the need for chemical goggles).

16. Plaintiff and consumers who purchased Roundup would not have done so had they known of its carcinogenic risks, or if defendant provided adequate warning on how to minimize these risks.

B. The IARC Classification of Glyphosate

17. In 2015, the International Agency for Research on Cancer ("IARC"), part of the World Health Organization ("WHO"), was tasked with conducting and coordinating research into glyphosate's carcinogenic properties.

18. In March 2015, an IARC "Working Group" of 17 experts from 11 countries convened to evaluate several insecticides and herbicides, including diazinon, tetrachlorvinphos, malathion, parathion, and glyphosate. The evaluation was based on a cumulative review of all

---

[4] Chemical Cartridge/Gas Mask Respirator: Gas masks are also known as "air-purifying respirators" because they filter or clean chemical gases out of the air as you breathe. This respirator includes a facepiece or mask, and a cartridge or canister. Straps secure the facepiece to the head. The cartridge may also have a filter to remove particles. Gas masks are effective only if used with the correct cartridge or filter (these terms are often used interchangeably) for a particular biological or chemical substance. Selecting the proper filter can be a complicated process. There are cartridges available that protect against more than one hazard, but there is no "all-inone" cartridge that protects against all substances. It is important to know what hazards you will face in order to be certain you are choosing the right filters/cartridges. U.S. Dep't of Labor, OSHA Bulletin, General Respiratory Protection Guidance for Employees and Workers.

publicly available and pertinent scientific studies. Some of the studies pertained to people exposed to through their jobs, such as farmers. Others were experimental studies on cancer and cancer-related effects in experimental systems.

19. In summer 2015, the IARC Working Group classified glyphosate as a Class 2A herbicide and concluded:

- glyphosate caused DNA and chromosomal damage in human cells and was probably carcinogenic to humans
- non-Hodgkin lymphoma was most associated with glyphosate exposure.

20. These conclusions were consistent with scientific developments that had occurred in prior decades.

C. Early Studies on Roundup's Carcinogenic Properties

21. Defendant should have been aware of glyphosate's carcinogenic properties for at least six (6) years.

22. On March 4, 1985, a group of the Environmental Protection Agency's ("EPA") Toxicology Branch conducted a study to evaluate the potential oncogenic (i.e., potential to cause cancer) responses on mice.

23. The group "classified Glyphosate as a Category oncogen," meaning it is a possible human carcinogen.

24. The findings of the Toxicology Branch were initially challenged by the EPA in 1991, which published a Memorandum entitled, "Second Peer Review of Glyphosate."

25. The Memorandum changed glyphosate's classification to Group E (evidence of non-carcinogenicity for humans).

26. This conclusion was not unanimous and the Memorandum "emphasized however, that designation of an agent in Group E is based on the available evidence at the time of evaluation and should not be interpreted as a definitive conclusion that the agent will not be a carcinogen under any circumstances."

27. Further studies and developments indicated glyphosate indeed posed (and still poses) a definite carcinogenic risk to humans.

28. In 1996, New York State sued Monsanto Company for false and misleading advertising by touting its glyphosate-based Roundup products as, e.g., "safer than table salt" and "practically non-toxic" to mammals, birds, and fish.

29. Monsanto resolved the lawsuit by

- agreeing to alter the advertising by removing any statements or implications the Products were biodegradable and environmentally friendly;

- paying $50,000 in costs

30. In 1997, Chris Clements, *et al.* published a study entitled, "Genotoxicity of Select Herbicides in *Rana catesbeiana* Tadpoles Using the Alkaline Single-Cell Gel DNA Electrophoresis (Comet) Assay."

31. Genotoxicity refers to the property of chemical agents which cause damage to genetic information within a cell causing mutations, which may lead to cancer. In Clements' publication, tadpoles were exposed to various herbicides, including Roundup, for a 24-hour period. Roundup-treated tadpoles showed "significant DNA damage when compared with unexposed control animals."

32. In 1999, Lennart Hardell and Mikael Eriksson published a study entitled, "A Case–Control Study of Non-Hodgkin Lymphoma and Exposure to Pesticides," which consisted of a

population-based case–control study in northern and middle Sweden encompassing 442 cases and twice as many controls was performed. Exposure data were ascertained by comprehensive questionnaires, and the questionnaires were supplemented by telephone interviews. The results indicated exposure to glyphosate and other herbicides yielded increased risks for Non-Hodgkin Lymphoma ("NHL").

33. In 2002, Julie Marc, et al. published a study entitled, "Pesticide Roundup Provokes Cell Division Dysfunction at the Level of CDK1/Cyclin B Activation." The study found Defendant's Roundup caused delays in the cell cycles of sea urchins. It further noted the deregulations of cell cycle checkpoints are directly linked to genomic instability, which can generate diseases and cause cancer. The findings led to the conclusion Roundup "causes changes in cell cycle regulation that may raise questions about the effect of this pesticide on human health."

34. In 2003, A. J. De Roos, et al. published a study entitled, "Integrative assessment of multiple pesticides as risk factors for non-Hodgkin's lymphoma among men," which "[r]eported use of several individual pesticides was associated with increased NHL incidence, including . . . glyphosate. A subanalysis of these 'potentially carcinogenic' pesticides suggested a positive trend of risk with exposure to increasing numbers."

35. In 2004, Julie Marc, et al. published another study entitled, "Glyphosate-based pesticides affect cell cycle regulation." In that study, which tested Roundup 3plus on sea urchin eggs, determined "glyphosate-based pesticides are clearly of human health concern by inhalation in the vicinity of spraying," given the "molecular link between glyphosate and cell cycle dysregulation." It observed, "roundup may be related to increased frequency of non-Hodgkin's lymphoma among farmers, citing the study by A. J. De Roos., et al.

36. In 2008, Mikael Eriksson, et al. published a study entitled, "Pesticide exposure as

risk factor for NHL including histopathological subgroup analysis," based on a case-control study of exposure to various pesticides as a risk factor for NHL. Eriksson's study strengthened previous associations between glyphosate and NHL.

37. In 2009, France's highest court ruled that Monsanto had not told the truth about the safety of Roundup. The French court affirmed an earlier judgment that Monsanto had falsely advertised its herbicide Roundup as "biodegradable" and that it "left the soil clean."

38. In 2009, Nora Benachour and Gilles-Eric Seralini published a study entitled, "Glyphosate formulations induce apoptosis and necrosis in human umbilical, embryonic, and placental cells," which examined the effects of four different Roundup formulations on human umbilical, embryonic, and placental cells—at dilution levels far below agricultural recommendations.

39. The study found the formations caused cell death in a few hours in a cumulative manner, caused DNA damage, and found that the formulations inhibit cell respiration. In addition, it was shown the mixture of the components used as Roundup adjuvants, particularly POEA (polyoxyethyleneamine) amplified the action of the glyphosate. The Roundup adjuvants actually changed human cell permeability and increased the toxicity of glyphosate alone.

D. Glyphosate-Based Herbicides, Including Roundup, are Banned Throughout the World

40. Following the IARC's report on glyphosate, several countries issued outright bans or restrictions on glyphosate herbicides, including Roundup.

41. In May 2015, the Netherlands banned all non-commercial use of glyphosate.[5]

42. In 2016, Italy adopted a law prohibiting the use of glyphosate in areas frequented by

---

[5] Arjun Wala, Why The Netherlands Just Banned Monsanto's Glyphosate-Based Herbicides, May 30, 2015.

9

the public or by "vulnerable groups" including children and the elderly and in the pre-harvest phase in agriculture.[6]

43. In June 2017, the Flemish banned glyphosate for individual-use.[7]

44. In September 2018, the Czech Republic announced the ban on the blanket use of glyphosate as a weedkiller and as a drying agent, effective January 1, 2019.[8]

45. In October 2018, the Indian state of Punjab banned the sale of glyphosate.[9]

46. In February of 2019, the Indian state of Kerala also banned the sale, distribution and use of glyphosate.[10]

47. In January 2019, French authorities banned the sale of Roundup following a court ruling that regulators failed to take safety concerns into account when clearing the widely used herbicide.[11]

48. In April 2019, a French appeals court ruled Monsanto business was liable for the health problems of a farmer who inhaled Roundup.[12]

49. In March 2019, Vietnam banned the import of all glyphosate-based herbicides.[13]

50. On July 2, 2019, Austria's lower house of parliament passed a bill banning all uses of glyphosate.

51. According to recent reports it is likely to pass Austria's upper house and is poised to become law.[14]

---

[6] Soil Association, Italy Bans Toxic Glyphosate, Aug. 27, 2016.
[7] The Belgian Times, Flemish government approves ban on glyphosate for individuals, July 1, 2017.
[8] Czech Republic to restrict use of glyphosate weedkiller, Phys.org, Sept. 17, 2018; Czech Mate for Roundup?, Arc 2020, Feb. 14, 2019.
[9] Punjab government bans sale of herbicide, The Hindu, Oct. 24, 2018.
[10] Kerala government bans glyphosate, deadly weed killer, The News Minute, Feb. 5, 2019.
[11] Weedkiller Roundup banned in France after court ruling, France 24, Jan. 16, 2019.
[12] Gus Trompiz and Catherin Lagrange, French Court Rules Bayer's Monsanto Weedkiller Liable for Farmer's Health Problems, Insurance Journal, Apr. 11, 2019.
[13] Vietnam Bans Import of Glyphosate Herbicides after US Cancer Trial Verdict, Sustainable Pulse, Mar. 25, 2019.
[14] Austrian parliament backs EU's first total ban of weedkiller glyphosate, Reuters, July 2, 2019.

52. On September 4, 2019, the German Federal Ministry for the Environment, Nature Conservation and Nuclear Safety issued a press release announcing Germany will ban the use of glyphosate by the end of 2023.

53. Several municipalities and regions in Spain, the United Kingdom, and the United States, have also banned glyphosate herbicides.

54. Over 20 states within the United States banned the use of glyphosate products or addressed health concerns over the use of products which contain glyphosate.

55. The State of California Benicia County has outlawed the use of glyphosate products, as well as several other counties.

56. The State of Florida Fish and Wildlife Conservation Commission has ceased the use of herbicides, glyphosate chief among them while the agency gathers more evidence of glyphosates harmful effects.

E. <u>Monsanto Loses Three Verdicts after Roundup is Found to Cause Cancer in Humans</u>

57. On August 10, 2018, a unanimous California jury in Johnson v. Monsanto Co., No. CGC16550128 (Cal. Super. Ct., Cnty. of S.F.) held MONSANTO COMPANY's Roundup and Ranger Pro herbicides were unsafe and were a substantial factor in causing harm to the plaintiff.

58. The jury also found MONSANTO COMPANY failed to adequately warn customers of the risks associated with its Roundup and stronger Ranger Pro products, and that the company acted with malice or oppression.

59. On March 27, 2019, a unanimous California jury in Hardemon v. Monsanto Co., No. 3:16-cv-00525-VC (N.D. Cal.) found MONSANTO COMPANY liable for failing to warn Roundup could cause cancer, liable for negligence, and liable in a design defect claim.

60. On May 13, 2019, a California jury found MONSANTO COMPANY likely caused

11

a couple's cancer in Pilliod v. Monsanto Co., No. RG17862702 (Cal. Super. Ct., Cnty. of Alameda).

61. The jury found on a preponderance of the evidence Roundup was a significant contributing factor in causing the plaintiff's NHL.

## Jurisdiction and Venue

62. Jurisdiction is proper pursuant to 28 U.S.C. § 1332(d)(2).

63. Upon information and belief, the aggregate amount in controversy is more than $5,000,000.00, exclusive of interests and costs.

64. This court has personal jurisdiction over defendant because it conducts and transacts business, contracts to supply and supplies goods within New York.

65. Venue is proper because plaintiff and many class members reside in this District and defendant does business in this District and State.

66. A substantial part of events and omissions giving rise to the claims occurred in this District.

## Parties

67. Plaintiff is a citizen of Queens County, New York.

68. In or around 2017 Plaintiff purchased the Product from one of defendant's stores in New York.

69. Defendant is a Washington corporation with a principal place of business in Issaquah, Washington (King County).

70. When Plaintiff purchased the Products, nothing on the product's label or in its advertising, marketing (including weekly ads, mailers and in-store PDP displays) made any indication that the product or its ingredients contained any carcinogenic agents or posed the risk

of cancer.

71. Had Plaintiff known the carcinogenic properties of the Products and its links to cancer at the time of purchase, she would not have purchased it.

## Class Allegations

72. The class will consist of all consumers who purchased the Products from defendant in New York during the relevant statutes of limitations.

73. Common questions of law or fact predominate and include whether

   a. Whether the products (and/or their ingredients) contain carcinogenic properties and/or poses a risk of cancer;

   b. Whether the existing labels on the products were adequate;

   c. Whether Defendant misrepresented or failed to disclose material facts to Plaintiffs and Class members regarding the carcinogenic properties of the Product and its ingredients;

   d. Whether Defendant's failure to warn Plaintiffs and members of the Classes of the Product's carcinogenic properties is material to reasonable consumers;

   e. Whether Defendant's marketing, distribution and/or sale of the Products is likely to deceive reasonable consumers;

   f. The representations were likely to deceive reasonable consumers and if Plaintiff and class members are entitled to damages.

74. Plaintiff's claims and the basis for relief are typical to other members because all were subjected to the same representations.

75. Plaintiff is adequate representative because their interests do not conflict with other members.

76. No individual inquiry is necessary since the focus is only on defendant's practices and the class is definable and ascertainable.

77. Individual actions would risk inconsistent results, be repetitive and are impractical to justify, as the claims are modest.

78. Plaintiff's counsel is competent and experienced in complex class action litigation and intends to adequately and fairly protect class members' interests.

79. Plaintiff seeks class-wide injunctive relief because the practices continue.

New York General Business Law ("GBL") §§ 349 & 350

80. Plaintiff incorporates prior paragraphs.

81. Defendant engaged in the marketing (including but not limited to weekly ads, mailers and PDP displays), distribution and/or sale of the Product, which contains the active ingredient glyphosate, and contains adjuvants, including POEA.

82. Defendant's failure to disclose the Product's carcinogenic properties and/or its potential to cause cancer are misleading and deceptive and have an effect on the general public.

83. Defendant had a duty to be aware of the risks of the Products due to the available information, *supra*.

84. Defendant advertised the Products with the intent not to sell it as advertised.

85. Defendant concealed and continues to conceal material facts concerning the probable carcinogenic nature of the products.

86. Plaintiff and members of the Class did not know the products posed the risk of cancer at the time they purchased the products and were not given proper use instructions.

87. Defendant's omissions were material.

88. Plaintiff and members of the Class were injured and suffered damages in reliance on defendant's representations or absence of same.

<u>Unjust Enrichment</u>

89. Plaintiff incorporates by references all preceding paragraphs.

90. Defendant obtained benefits and monies because the Products were not as represented and expected, to the detriment and impoverishment of plaintiff and class members, who seek restitution and disgorgement of inequitably obtained profits.

<u>Jury Demand and Prayer for Relief</u>

Plaintiff demands a jury trial on all issues.

**WHEREFORE,** Plaintiff prays for judgment:

1. Declaring this a proper class action, certifying plaintiff as representative and the undersigned as counsel for the class;

2. Entering preliminary and permanent injunctive relief by directing defendant to correct the challenged practices to comply with the law;

3. Injunctive relief to remove and/or refrain from the challenged representations, restitution and disgorgement for members of the State Subclasses pursuant to the consumer protection laws of their States;

4. Awarding monetary damages and interest, including treble and punitive damages, pursuant to the common law and consumer protection law claims, and other statutory claims;

5. Awarding costs and expenses, including reasonable fees for plaintiffs' attorneys and experts; and

6. Other and further relief as the Court deems just and proper.

Dated:   September 16, 2019

                                              Respectfully submitted,

                                              Sheehan & Associates, P.C.
/s/Spencer Sheehan
Spencer Sheehan
505 Northern Blvd., Suite 311

                                        Great Neck, NY 11021
                                        (516) 303-0552
                                        *spencer@spencersheehan.com*
                                        E.D.N.Y. # SS-8533
                                        S.D.N.Y. # SS-2056

1:19-cv-05278
United States District Court
Eastern District of New York

Suseel Thomas individually and on behalf of all others similarly situated

                                Plaintiff

    - against -

Costco Wholesale Corporation

                                Defendant

## Complaint

```
Sheehan & Associates, P.C.
 505 Northern Blvd., #311
   Great Neck, NY 11021
   Tel: (516) 303-0552
   Fax: (516) 234-7800
```

Pursuant to 22 NYCRR 130-1.1, the undersigned, an attorney admitted to practice in the courts of New York State, certifies that, upon information, and belief, formed after an inquiry reasonable under the circumstances, the contentions contained in the annexed documents are not frivolous.

Dated: September 16, 2019

                                                                 /s/ Spencer Sheehan
                                                                   Spencer Sheehan